# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ROBERT SCOTT WAGNER | ) | Case No. 12-13285-BFK |
| | ) | Chapter 11 |
| Debtor | ) | |
| | ) | |
| Asset Management Holdings, LLC | ) | |
| servicing agent for SW Linear Investment | ) | |
| Group, LLC, assignee of GMAC Mortgage | ) | |
| LLC dba ditech., | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| v. | ) | No. 13-01159 |
| | ) | |
| Wells Fargo Bank, N.A., et al. | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION AND ORDER
## GRANTING PLAINTIFF'S MOTION FOR
## SUMMARY JUDGMENT AND DENYING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## ON COUNT I OF THE PLAINTIFF'S AMENDED COMPLAINT
## (EQUITABLE SUBROGATION)

This matter comes before the Court on the parties' cross-motions for summary judgment.
Docket Nos. 32 (Plaintiff's Motion for Summary Judgment), 33 (Defendant Wells Fargo's
Motion for Summary Judgment). Both parties have filed Oppositions (Docket Nos. 47, 49) and
Reply Memoranda (Docket Nos. 52, 53). The Plaintiff also filed an unauthorized Supplemental
Response. Docket No. 54. The Court heard oral argument on the cross-motions on October 2,
2013.

In Count I of the Plaintiff's Amended Complaint, the Plaintiff seeks equitable
subrogation, claiming that it is entitled to occupy the second lien position with respect to the
Debtor's property. Count II alleges that the Defendant, Wells Fargo Bank, N.A. (or more

accurately, its predecessor, Wachovia Bank), was on actual notice of the Plaintiff's lien, and

therefore, Wells Fargo is subject to the Plaintiff's lien pursuant to Virginia's recording statute,

which is a "race-notice" statute. *See* Va. Code § 55-96 (deeds, deeds of trust and other

instruments "shall be void as to all purchasers for valuable consideration without notice not

parties thereto and lien creditors, until and except from the time it is duly admitted to record….")

At the October 2nd hearing, the Court denied both of the parties' Motions with respect to Count

II of the Amended Complaint, finding that there were material facts in dispute with respect to

Count II.

For the reasons stated below, the Court will grant the Plaintiff's Motion, and will deny

the Defendant's Motion, with respect to Count I.[1]

## Undisputed Facts

While the parties dispute many of the facts surrounding each of the transactions at issue,

the Court finds that the *material* facts are not genuinely in dispute for purposes of Count I.

A.  *The Arlington Property, and the Debtor's Acquisition of Dr. Mogari's Dental Practice.*

1.      The Debtor in this case, Dr. Wagner, is a dentist. He owns a condominium unit at

2723-A South Walter Reed Drive, Arlington, VA 22206 (the "Property"). Dr. Wagner filed a

voluntary petition under Chapter 11 with this Court on May 23, 2012. As of the confirmation

hearing (discussed below), he was still a Debtor in Possession, and no trustee had been

appointed.

2.      The Property is subject to a first lien Deed of Trust in favor of GMAC Mortgage,

in the original principal amount of $116,500. This Deed of Trust was recorded on April 8, 2003,

---

[1]   Because Count II remains pending, this Order is not a final Order under Bankruptcy Rule 7054. There is, therefore, no need for a separate document under Rule 7058 (incorporating F.R. Civ. P. 58(a)) entering judgment on Count I.

at Deed Book 3488, page 2664 of the land records of Arlington County. GMAC's servicer,

Green Tree Servicing, LLC, filed a proof of claim in the case, asserting that the balance on this

loan at the time of the filing was $47,987.83. Proof of Claim No. 1-1. In his Modification

Agreement with Wells Fargo (discussed below), the Debtor represented that the balance due on

this first trust loan was $47,988. Debtor's Corrected Amended Disclosure Statement, Docket No.

64, Ex. C (Modification Agreement), p. 2.

3.    In June 2007, the Debtor took out a home equity line of credit ("HELOC") loan,

also with GMAC, in the principal amount of $90,000. This loan was secured by a second priority

lien against the Property. The Deed of Trust securing this lien was recorded on June 14, 2007, at

Deed Book 4107, page 337 of the land records of Arlington County. The Deed of Trust and

Assignment of Rents provides in part as follows:

**Priority of Advances**

The lien of this Deed of Trust will attach on the date this Deed of Trust is recorded. The
indebtedness evidenced by the Credit Documents is a revolving indebtedness. The Credit
Documents provide that amounts may be advanced, repaid and readvanced from time to
time in accordance with the terms and provisions of the Agreement. Accordingly, the
aggregate advances during the term of the Credit Documents may exceed the Credit
Limit. However, the Total Balance Outstanding less FINANCE CHARGES at any time
(the "Earning Balance Outstanding") shall never exceed the Credit Limit, except for
advances made to protect the lien of this Deed of Trust. We agree that the lien and
security title of this Deed of Trust shall not be deemed released or extinguished by
operation of law or implied from the intent of the parties if the Total Balance Outstanding
is zero as of the date of this Deed of Trust or is from time to time reduced to zero by
payments made to LENDER.

Plaintiff's Ex. 13 (WF 01149-01150).

4.    In the Summer of 2007, the Debtor determined that he would form his own dental

practice. In order to accomplish this, he decided that he would purchase the assets of Sam

Mogari DDS, P.C., and would form a professional corporation known as Robert Wagner DDS,

P.C. The Debtor decided to do two things in order to finance the purchase of the assets of Dr.

Mogari's dental practice. First, he would apply for an SBA loan with Wachovia SBA Lending, Inc. ("Wachovia"), in the amount of $950,000. Second, he would increase the GMAC HELOC from $90,000 to $140,000. It is not clear whether Dr. Wagner advised GMAC, on the one hand, that he was applying for the SBA loan from Wachovia. Nor is it entirely clear, on the other hand, whether Dr. Wagner advised Wachovia that he was applying for an increase on his HELOC loan with GMAC, and if so, in what amount.

5.      It is clear, however, that Wachovia understood that it would be taking a first priority lien on all of the assets of the dental practice, and a third priority lien on Dr. Wagner's home, behind GMAC's $90,000 second lien, in order to secure its loan. *See* Wachovia Credit Memorandum, WF 0036-0043  ("Collateral: Third, 2723-A South Walter Reed Drive, Arlington, VA 22206); Wachovia Conditional Approval Letter (May 30, 2007), WF 00841-00845 ("Guaranty of Robert Scott Wagner, secured by Deed of Trust/Mortgage of Third Priority on Borrower's property at 2723-A South Walter Reed Drive, Arlington, VA 22206); SBA Authorization, WF 0058-0067 ("Secured by Third Deed of Trust (including an Assignment of Rents) on land and improvements located at 2723-A South Walter Reed Drive, Arlington, VA 22206. Subject only to prior lien(s) as follows: First: GMAC Mortgage in the amount of $116,500.00; Second: GMAC Mortgage in the amount of $90,000"); First American Title Insurance Company Commitment, WF-00495-00496, Schedule B-2 Exceptions, ¶ 15 (noting the GMAC second lien as an Exception to the title insurance commitment); Settlement Statement, WF-00715-00717 ("Collateral: Third Deed of Trust on 2723-A South Walter Reed Drive, Arlington, VA 22206"). *See also* Affidavit of Edward F. Bach, Wells Fargo Loan Adjustor, Docket No. 34 Ex. 5, ¶ 4 ("On August 29, 2007, Wells Fargo understood that its lien that secured Wells Fargo's 2007 Loan was in a third position, and was subject to only the following two liens

4

that encumbered Wagner's residential property ('Wagner's Property'): (1) a $116,000 Mortgage funded by GMAC (GMAC's $116,000 Mortgage) and (2) a $90,0000 Mortgage Loan funded by GMAC ('GMAC's $90,000 Mortgage')").

6.      Dr. Wagner was approved for both the SBA loan and for his $140,000 HELOC loan with GMAC. The $140,000 GMAC HELOC loan closed on August 20, 2007. In connection therewith, Dr. Wagner executed a Home Equity Line of Credit Open-End Agreement, and a Deed of Trust. Docket No. 32, Ex's 12 and 13.

7.      As a part of the closing, $84,529 of the loan proceeds were paid to satisfy in full the prior, $90,000 GMAC HELOC loan, $7,000 went to Dr. Wagner, and $687 was paid toward closing costs. Docket No. 35 (Defendant's Statement of Undisputed Facts), ¶ 8; Docket No. 48 (Plaintiff's Statement in Response).

8.      GMAC did not perform a title search in connection with the closing on its $140,000 HELOC loan. Docket No. 35 (Defendant's Statement of Undisputed Facts), ¶ 12; Docket No. 48 (Plaintiff's Statement in Response). Further, GMAC did not immediately record its Deed of Trust. The Deed of Trust was recorded on September 27, 2007, at Deed Book 4137, page 1456 of the land records of Arlington County. Docket No. 32, Ex. 13.

9.      Dr. Wagner also was approved for his SBA loan. The loan closed on August 29, 2007. Wachovia recorded its Deed of Trust on August 31, 2007, at Deed Book 4131, page 1509 of the land records of Arlington County. Docket No. 34, Ex. 22.

10.      Dr. Wagner defaulted on his loan with Wachovia. Wachovia reduced its claim to a judgment, which was recorded in the land records of Arlington County, on April 28, 2011. Docket No. 35, Defendant's Statement of Undisputed Facts ¶ 24; Docket No. 48 (Plaintiff's Statement in Response).

11.     The GMAC $90,000 Deed of Trust was released on December 9, 2011, at Deed Book 4513, page 625 of the land records of Arlington County. Docket No. 41, Ex. 14 (Certificate and Affidavit of Satisfaction).

12.     Thus, as of the filing of Dr. Wagner's bankruptcy case, and according to the land records, GMAC remained in the first lien position with a debt of approximately $47,988, Wachovia's loan was in the second lien position, and the GMAC $140,000 Deed of Trust occupied the third lien position, on Dr. Wagner's property.

*B.  Asset Management's Acquisition of the $140,000 GMAC Loan.*

13.     Asset Management purchased the GMAC $140,000 loan in September 2011, before this bankruptcy case was filed. Affidavit of Lance Cassgnol, Docket No. 32, ¶ 11. Asset Management paid $15,557.06 for the Loan. *Id.* Dr. Wagner was in default on the GMAC $140,000 HELOC loan at the time that Asset Management purchased the loan, which was classified by GMAC as a non-performing loan. Docket No. 35, Defendant's Statement of Undisputed Facts ¶¶ 30, 31; Docket No. 48 (Plaintiff's Statement in Response).

14.     The only due diligence conducted by Asset Management prior to its acquisition of the loan was to run a credit report on Dr. Wagner, and to review the value of the Property as reported on Zillow.com. *Id.*, ¶ 39. Asset Management did not have a title search performed before it acquired the loan. *Id.*, ¶ 36.

*C.  The Bankruptcy Case.*

15.     Unfortunately, Dr. Wagner's dental practice was not successful. As noted above, he filed for Chapter 11 relief on May 23, 2012.

16.     On February 25, 2013, the Court approved Dr. Wagner's Corrected Amended Disclosure Statement, and set a confirmation hearing for March 19, 2013. Docket No. 62.

17.     Dr. Wagner's Plan rested on a settlement that he had reached with Wachovia's

successor by merger, Wells Fargo. Under Dr. Wagner's Plan, Wells Fargo would be treated as a

secured creditor in the amount of the value of the property, $267,500, less the value of the first

GMAC lien in the amount of approximately $47,988. The secured portion of Wells Fargo's

claim would be paid at an interest rate of 6%, with a 20 year amortization, and a maturity date of

May 1, 2018. The balance of Wells Fargo's claim would be treated as a Class 4 unsecured claim.

GMAC's $140,000 HELOC loan was to be treated as a wholly unsecured, Class 4 claim. Docket

No. 64, Corrected Amended Disclosure Statement (Second).

18.     On March 14, 2013, Asset Management noted its appearance by counsel in the

case, and filed Objections to confirmation of Dr. Wagner's Chapter 11 Plan of Reorganization.

Docket Nos. 66, 67.

19.     Asset Management's introduction to its Objections stated as follows:

On August 20, 2007, GMAC loaned money to the Debtor in the principal amount
of $140,000.00. The Debtor signed a Note and Deed of Trust. The intent of the parties
was that the Deed of Trust must occupy the second lien position on the debtor's real
property. The Note and Deed of Trust were filed in the land records of Arlington County,
Virginia and the Deed of Trust was properly perfected in due course.

According to the original schedules filed in this Chapter 11 case (which have
never been amended) Debtor originally reorganized [*sic* – should be "recognized"] the
secured status of this claimant and identified it as holding a perfected second deed of trust
lien on Debtor's condominium residence located at 2723 S. Walter Reed Drive,
Apartment A, Arlington, Virginia 22206. On November 30, 2011, the Note and Deed of
Trust were assigned by GMAC to the current holder, Asset Management Holdings, LLC,
servicer for SW Linear Investment Group, LLC.

Debtor evidently secured additional funding from a third party source, unknown
to GMAC, or Asset Management Holdings, LLC, or SW Linear Investment Group, LLC.
In direct violation of the Debtor's obligations to GMAC/Asset Management Holdings,
LLC, the third party's Note and Deed of Trust were filed and recorded in the land records
evidently one day prior to this Claimant's documents. This now evidently places Asset
Management Holdings, LLC in a third position on the real estate.

Docket No. 67, pp. 1-2.

20.     Asset Management objected to Dr. Wagner's Plan on a number of grounds, including the absolute priority rule (11 U.S.C. § 1129(b)(2)(B)(ii)), and the fact that Dr. Wagner was not contributing 5 years of disposable income (11 U.S.C. § 1129(a)(15)). In its Objections, Asset Management did not assert that it was equitably subrogated to GMAC's $90,000 lien; rather, the Asset Management Objections assumed that Asset Management was in a third position, based on the recording dates of the Deeds of Trust, and further acknowledged that the Asset Management claim was entirely unsecured, as set out in Dr. Wagner's Disclosure Statement and Plan. Docket No. 67, p. 2.

21.     On March 19, 2013, after an evidentiary hearing, the Court denied confirmation of Dr. Wagner's Plan. Docket Nos. 73, 74.

22.     Dr. Wagner filed a Third Amended Disclosure Statement and Plan on May 1, 2013. Docket Nos. 77, 78.

23.     The Amended Plan again relied upon the proposed Modification Agreement with Wells Fargo. As in the previous Plan, Wells Fargo would be treated as a secured creditor behind GMAC's first lien, and the balance of its claim would be treated as an unsecured claim. Asset Management's claim would be treated as wholly unsecured. The Court approved the Third Amended Disclosure Statement on May 29, 2013. Docket No. 83.[2]

24.     The following day, May 30, 2013, new counsel for Asset Management entered his appearance in the case. Docket No. 84.[3]

---

[2]   The Plan actually gave Asset Management a $10,000 secured claim, in the hope that Asset Management would support the Plan and vote in its favor. After Asset Management voted against the Plan and objected to confirmation, the Debtor orally amended the Plan at the confirmation hearing to delete the Class 3 $10,000 secured claim in favor of Asset Management, and to treat the entire Asset Management claim as unsecured.

[3]   Asset Management's former counsel was granted leave to withdraw on July 2, 2013. Docket No. 101.

25.      On June 17, 2013, Asset Management, through its new counsel, filed this adversary proceeding, seeking among other things, equitable subrogation to the $90,000 GMAC lien position. Asset Management also filed Objections to confirmation of the Debtor's Amended Plan, this time asserting that it was entitled to equitable subrogation to the GMAC $90,000 lien position. Docket No. 91.

26.      On July 15, 2013, the Court held a second confirmation hearing in the case. At the hearing: (a) the Debtor made an oral Motion to amend the Plan to delete the $10,000 secured class of claim (Class 3), and to treat Asset Management's claim as wholly unsecured, which the Court granted; (b) the Court found, based on the Debtor's unrebutted testimony, that the value of the property was $267,500; (c) the Debtor orally amended the Plan to provide that he would pay the Class 4 unsecured claimants a total of $27,300 on the Effective Date of the Plan, which the Debtor would borrow from his 401(k) Plan, and which the Court found satisfied the requirements of 11 U.S.C. § 1129(a)(15); and (d) the Court took Asset Management's absolute priority objection under advisement. Ultimately, the Court found that the Debtor had sufficient votes to confirm the Plan as a consensual plan under Section 1129(a) of the Bankruptcy Code, and that the Court therefore did not need to resolve the absolute priority objection under Section 1129(b) of the Code. The Court ruled that it would confirm Dr. Wagner's Plan conditionally, the condition being that the resolution of this adversary proceeding would not render the Plan infeasible. Docket No. 107.[4]

---

[4]   The Order Overruling Objections to Confirmation of Chapter 11 Plan and Conditionally Confirming Chapter 11 Plan provided in part as follows: "The Debtor's Plan is conditionally confirmed, the condition being that the Debtor is the prevailing party in the Adversary Proceeding (or some other resolution of the Adversary Proceeding that would not render the Plan infeasible)." Docket No. 107, ¶ 2.

*D.  The Resolution of the SBA Loan.*

27.      Wells Fargo has filed a proof of claim for $1,131,244.59. Claim No. 4-2. At this

point, Wells Fargo acknowledges that is has received $647,628.11 from the SBA on its guaranty

of the loan. Wells Fargo's Opposition to Plaintiff's Motion for Summary Judgment, Docket No.

49, fn. 5. Notwithstanding this payment from the SBA, Wells Fargo remains the agent for

collection of the loan on behalf of the SBA.

## Conclusions of Law

Summary judgment is appropriate where there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056. The

moving party has the initial burden of showing that there are no material facts in dispute, and that

it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24

(1986). When the moving party has met its initial burden, the burden then shifts to the

nonmoving party to present specific facts demonstrating that there is a genuine issue for trial.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

Whether a fact is material or not depends on the substantive law at issue in the case.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Only disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as

an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy

and inexpensive determination of every action.' Fed.Rule Civ.Proc. 1." *Celotex Corp.*, 477 U.S.

at 327.

The Court looks to applicable non-bankruptcy law to determine the property rights and interests of the parties. *Butner v. United States,* 440 U.S. 48, 55 (1979); *Lee v. Anasti (In re Lee),* 461 Fed. Appx. 227, 233 (4th Cir. 2012). In this case, there is no dispute that the law of the Commonwealth of Virginia, the location of the Property and the place where all of the Deeds of Trust were recorded, applies.[5]

   1. *Equitable Subrogation – General Principles.*

Equitable subrogation has a long history in the property law of the Commonwealth of Virginia. The Virginia Supreme Court has described the principal of equitable subrogation as follows:

> "Subrogation is the substitution of another person in place of the creditor to whose rights he succeeds in relation to the debt. This doctrine is not dependent upon contract, nor upon privity between the parties; it is the creature of equity, and is founded upon principles of natural justice." 179 Va. at 401, 18 S.E.2d at 920. "Subrogation not being a matter of strict right, but purely equitable in its nature, dependent upon the facts and circumstances of each particular case, no general rule can be laid down which will afford a test in all cases for its application." *Id.* at 402, 18 S.E.2d at 920. Nevertheless, we have expressly acknowledged that "Virginia has long been committed to a liberal application of the principle of subrogation." *Id.*

*Centreville Car Care, Inc. v. North Am. Mortg. Co.*, 263 Va. 339, 345 559 S.E.2d 870, 872 (2002) (quoting *Federal Land Bank of Baltimore v. Joynes*, 179 Va. 394, 401-02, 18 S.E.2d 917, 920 (1942)).

Two principles have been applied consistently by the Virginia Supreme Court in the context of equitable subrogation. First, subrogation is not appropriate where intervening equities

---

[5]   At the outset of this adversary proceeding, Dr. Wagner filed a Motion to Dismiss the Plaintiff's Complaint under Bankruptcy Rule 7012, on the ground that GMAC's $140,000 Deed of Trust did not comply with Virginia Code § 55-58.3. Section 55-58.3 allows lenders to maintain the same priority of a refinanced deed of trust, provided that the new deed of trust contains certain statutory language ("This is a refinance Deed of Trust, Mortgage, etc."), and that the refinance deed of trust not increase the amount of the loan by more than $5,000. The Court denied Dr. Wagner's Motion to Dismiss, holding that the common law remedy of equitable subrogation, sought here by the Plaintiff, was not supplanted by Va. Code § 55-58.3. Docket No. 21.

are prejudiced. *Id.*, at 872. Second, ordinary negligence of the party claiming equitable

subrogation does not bar the application of subrogation, where the equities strongly favor the

subrogee. *Id.* All of the cases agree that the application of the principle of equitable subrogation

is necessarily "fact-specific." *Id.* See also *Bank of New York Mellon Trust Co., N.A. v. Tysons

Fin., LLC (In re Botero-Paramo),* 483 Fed. Appx. 779, 786 (4th Cir. 2012) (noting that "the fact-

intensive inquiry required in subrogation claims generally does not support bright line rules").

Equitable subrogation claimants have not fared well in the Virginia courts in recent years,

at least in the reported cases. The equitable subrogation claimant lost in *Centreville Car Care*.

The subrogees lost as well in *Deutsche Bank National Trust Co. v. U.S.,* 2013 WL 3973420

(E.D. Va. 2013), in *Deutsche National Bank Trust Co. v. Batmangheldij (In re Batmangheldij),*

2007 WL 2713109 (E.D. Va. 2007), *aff'd* 361 Fed. Appx. 527 (4th Cir. 2010), in *In re Botero-

Paramo,* 445 B.R. 530 (Bankr. E.D. Va. 2011), *aff'd* 483 Fed. Appx. 779, 786 (4th Cir. 2012),

and in *In re Perrow*, 2013 WL 4787956 (Bankr. W.D. Va. 2013). Still, *Centreville Car Care* did

not announce the death of equitable subrogation; rather, the Virginia Supreme Court reiterated

that "Virginia has long been committed to a liberal application of the principle of subrogation."

236 Va., at 345; 559 S.E.2d, at 872. *See also Federal Land Bank of Baltimore,* 179 Va. at 402;

18 S.E.2d at 920 ("'In no other jurisdiction has the doctrine been more firmly adhered to or more

liberally expounded and applied, to meet the exigencies of particular cases, than in Virginia'")

(quoting *Sands' Adm'r v. Durham,* 99 Va. 263, 38 S.E. 145 (1901)).

   *2.  Is Asset Management a "Volunteer?"*

Wells Fargo opposes Asset Management's claim on a number of grounds. First, Wells

Fargo argues that Asset Management is a "volunteer," citing *Deutsche Bank National Trust Co.*

Here, though, the relevant inquiry is whether GMAC acted as a volunteer in paying off the

previous $90,000 HELOC loan, not whether Asset Management acted as a volunteer in acquiring

the GMAC loan. Asset Management's acquisition of GMAC's loan was entirely fortuitous as far

as Wells Fargo is concerned. Wells Fargo should not stand to benefit by moving up in priority

into the second lien position as a result of Asset Management's acquisition of the GMAC loan.

*See, e.g.*, *Am. Surety Co. of New York v. Bethlehem Nat'l Bank*, 314 U.S. 314, 318 (1941)

(creditors should not "profit solely because of fortuitous circumstances and without any relation

to reasons of intrinsic fairness"). As the Fourth Circuit has stated, junior lien holders "do not

have the right to expect that senior liens will not change hands. When the transaction merely

substitutes one senior lien holder for another without increasing the amount of senior debt, the

junior lien holder cannot complain." *Deutsche Bank Nat'l Trust Co. v. I.R.S.*, 361 Fed. Appx.

527, 530 (4th Cir. 2010).

A party is considered to be a volunteer where, "in making a payment, they have no

interest of their own to protect, they act without any obligation, legal or moral, and they act

without being requested to do so by the person liable on the original obligation." *Mort v. U.S.,* 86

F.3d 890, 894 (9th Cir. 1996) (applying Nevada law). "A person who lends money to pay off an

encumbrance on property and secures the loan with a deed of trust on that property is not a

volunteer for purposes of equitable subrogation." *Id.*; *ContiMortgage Corp. v. U.S.,* 109 F. Supp.

2d 1038, 1043 (D. Minn. 2000). *See also Columbia Community Bank v. Newman Park, LLC*, 177

Wash.2d 566, 304 P.3d 472 (2013) (adopting the Restatement (Third) of Property: Mortgages §

7.6, which provides: "By way of illustration, subrogation is appropriate to prevent unjust

enrichment if the person seeking subrogation performs the obligation … upon a request from the

obligor or the obligor's successor to do so, if the person performing was promised repayment and

reasonably expected to receive a security interest in the real estate with the priority of the

mortgage being discharged, and if subrogation will not materially prejudice the holders of

intervening interests in the real estate."); *Eastern Savings Bank v. Pappas,* 829 A.2d 953, 959-60

(D.C. App. 2003); *G.E. Capital Mortgage Servs., Inc. v. Levenson*, 338 Md. 227, 237-38, 657

A.2d 1170, 1175 (1995) ("The great majority of case law holds that one who pays the mortgage

of another and takes a new mortgage as security will be subrogated to the rights of the first

mortgage as against any intervening lienholder.") GMAC acted at the request of Dr. Wagner, in

his request to refinance the previous HELOC loan.

 If Wells Fargo's position were correct, then refinance lenders would *never* be entitled to

equitable subrogation. The "volunteer" limitation on equitable subrogation would swallow up the

doctrine. This Court allowed equitable subrogation in favor of a refinance lender in *Mayer v.*

*United States* (*In re Reasonover*), 236 B.R. 219 (Bankr. E.D. Va. 1999), aff'd *Mayer v. United*

*States*, No. 99–989–A and 99–990–A (E.D. Va. 1999).[6]  In *The Federal Land Bank of Baltimore*

*v. Joynes*, the seminal case on equitable subrogation in Virginia, the Federal Land Bank of

Baltimore was allowed equitable subrogation, having paid off the Virginian Joint Stock Land

Bank. 179 Va. 394, 18 S.E.2d 917 (1942). The Court is not aware of any cases from the Virginia

Supreme Court reading the "volunteer" limitation on equitable subrogation so broadly.

 GMAC did not act as a volunteer in connection with the refinance of its prior loan.

 *3.  Does Wells Fargo Occupy the Position of an Intervening Lienholder?*

 Wells Fargo next argues that it is in the position of an intervening lienholder, and is

entitled to the protections afforded intervening equities. But, Wells Fargo is not truly in the

position of an intervening lienholder, because it specifically bargained for the position of a third

---

[6]   The Fourth Circuit, in an unpublished per curium decision, later remanded the case for consideration of a different issue, that of the applicability of Bankruptcy Code Section 550(b). *Countryside Home Loans, Inc. v. King (In re Reasonover),* No. 99–2534 and 99–2620, 238 F.3d 414 (4th Cir. 2000) (table). See *In re Reasonover,* 2001 WL 1168181 (Bankr. E.D. Va. 2001).

priority lien. *See* Finding of Fact No. 5, above. "At its heart, the doctrine of equitable

subrogation is concerned with restoring the interests of the parties to their intended position

relative to others." *In re Perrow*, 2013 WL 4787956, at *14.

The point is illustrated by the Restatement (Third) of Restitution and Unjust Enrichment,

as follows:

> A competing lienor who has actually extended credit in reliance on the apparent absence
> of prior liens would normally be entitled to both defenses. The fact that a given claim is
> asserted via subrogation does not entitle it to an automatic priority, and the equitable
> origins of the subrogation remedy counsel against its application to the prejudice of
> competing claimants. See § 57(3) and Illustration 11, supra.
>
> Subrogation against intervening interests is permitted, by contrast, where the effect of
> reviving a prior encumbrance is merely to restore the various lienors to the priorities they
> properly occupy. See Illustrations 4 and 8-11, supra; see also § 8, Comments b, e, and f
> (explaining that intervening lienors are protected against prejudice by the standard
> affirmative defenses).

Restatement (Third) of Restitution and Unjust Enrichment, § 57, Comment g ("Equitable

Limitations"). *See also Id*., Comment b ("Subrogation to Security") ("Subrogation to a secured

claim is primarily justified in such cases by the need to avoid the unjust enrichment of competing

creditors at the claimant's expense. Subrogation of the claimant is not prejudicial to the other

creditors, because its purpose and effect is to confirm the several claims against the defendant's

property in their intended priorities.") Wells Fargo did not extend credit based on the absence of

the GMAC lien in the land records, when it extended its loan to Dr. Wagner. To the contrary, all

of Wells Fargo's own documents confirm that it fully expected to be in a third position, behind

GMAC's $90,000 lien. *See* Finding of Fact No. 5, above.

Wells Fargo's position stands in contrast to the positions of the parties opposing equitable

subrogation in a number of the recently reported equitable subrogation cases, many of whom

were intervening lienholders. In the most recent *Deutsche Bank Nat'l Trust Co. v. U.S.* case, the

15

Justice Department had filed a Notice of Lien for Fine and/or Restitution Imposed Pursuant to

the Anti–Terrorism and Effective Death Penalty Act of 1996. 2013 WL 3973420, at *1. The

government's restitution lien occupied the position of an intervening lienholder, and the

government never bargained for a position behind that of the IndyMac Loan II (for which

equitable subrogation was sought). *Id.* Similarly, in *Deutsche Nat'l Bank Trust Company v.*

*Batmanghelidj (In re Batmanghelidj)*, KFH Investment's judgment lien, and the IRS's Notices of

Tax Liens, also occupied the position of intervening lienholders, with no bargained-for lien

position with respect to the properties at issue. 2007 WL 2713109, at *1.[7]

Wells Fargo relies heavily on *Centreville Car Care* to support its position. But, in

*Centreville Car Care*, the Virginia Supreme Court found the separation of the equitable title in

the property from the obligation to pay the prior lien to be of great significance. In *Centreville*

*Car Care,* the Bouzghaias purchased the property, without picking up in a title search the

recorded second Deed of Trust lien of Centreville Car Care. The closing agent paid off the first

lien of the sellers, Lynch and Higassi, resulting in the Centreville Car Care lien moving up into

first priority. North American Mortgage, the Bouzghaias' mortgage lender, which had expected

to be put into a first lien position, claimed that it was equitably subrogated to the sellers'

mortgage lender's lien position. The Court, in rejecting North American Mortgage's claim,

reasoned as follows:

> [G]ranting subrogation to North American Mortgage would result in the obligors on the
> debt secured by the lien of the first deed of trust being different from the obligors on the
> debt secured by the lien of Centreville's deed of trust. Moreover, the latter obligors would
> no longer have an equitable ownership in the property subject to Centreville's lien. The
> realities are that under those circumstances Centreville would be prejudiced because there
> would be no incentive for Lynch and Higassi to pay their debt to Centreville in order to

---

[7]   In this case, Wells Fargo's judgment lien was recorded in April 2011, before the release of the $90,000 GMAC
Deed of Trust in December 2011, and well after recordation of GMAC's $140,00 Deed of Trust in September 2007.
Wells Fargo, therefore, cannot claim intervening lienholder status by virtue of its judgment lien.

protect any equitable ownership in the property. In addition, there would be little, if any, reason to anticipate that the Bouzghaias would pay the debt secured by North American Mortgage's lien on their property because the property would remain encumbered by Centreville's lien. Under this circumstance, the primary realities are that upon the chancellor's granting of subrogation, North American Mortgage and the Bouzghaias would logically effect a "friendly foreclosure" to eliminate Centreville's lien and leave Centreville with little or no recovery under the foreclosure sale. Equity will not condone the creation of such a circumstance, especially when that circumstance flows directly from the negligence of the party seeking the benefit of it to the prejudice of an innocent party.

263 Va. at 347-48, 559 S.E.2d at 874.

Unlike *Centreville Car Care*, there has been no separation of equitable title to the property and the obligation to pay, in this case.

The availability of legal remedies against third parties such as title search firms and title insurance companies, was also an equitable factor taken into account in *Centerville Car Care*. The Court finds that this factor favors neither party in this case. On the one hand, Asset Management appears to have no third party claims because it didn't conduct a title search prior to acquiring the loan and, therefore, has no one to sue.[8]  On the other hand, Wells Fargo does not appear to have any third party claims available to it, precisely because it bargained for a third priority lien position, and it accepted a title insurance policy with the $90,000 GMAC lien as an exception. *See* First American Title Insurance Company Commitment, WF-00495-00496, Schedule B-2 Exceptions, ¶ 15 (noting the GMAC second lien as an Exception to the title insurance commitment).

The Court finds that Wells Fargo does not occupy the position of an intervening lienholder in this case.

---

[8]  Though it isn't entirely clear, the record appears to reflect that GMAC did not have a title insurance policy to assign to Asset Management when it purchased the loan. *See* Docket No. 34, Ex. 6 at 28: 22-24; 37: 2-22.

4.   *Wells Fargo Has Not Changed its Position Materially in Reliance on Asset
Management's Belated Assertion of its Claim for Equitable Subrogation.*

Wells Fargo next argues that it has changed its position to its detriment in reliance on

Asset Management's failure to timely assert its claim of equitable subrogation. Specifically,

Wells Fargo claims that it negotiated the Modification Agreement and Plan in reliance on the

fact that it is in the second lien position, at least insofar as the land records would indicate.

Although Asset Management's equitable subrogation claim was brought late in the game, Asset

Management has not waived its rights. Its first set of Objections to confirmation of the Debtor's

Plan did not raise equitable subrogation as an issue, and essentially conceded that it was in the

third lien position. However, the Court did not make any rulings adverse to Wells Fargo based on

Asset Management's concession. *See Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, 169 (2010)

(judicial estoppel typically applies when "a party has succeeded in persuading a court to accept

that party's earlier position, so that judicial acceptance of an inconsistent position in a later

proceeding would create the perception that either the first or the second court was misled")

(quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).[9]

In the end, Asset Management's assertion of its equitable subrogation claim came just in

time, in advance of the second confirmation hearing. The Court confirmed the Plan

conditionally, based on the outcome of this adversary proceeding. Docket No. 107. Wells Fargo

cannot be heard to claim that it has been prejudiced by the belated assertion of Asset

Management's equitable subrogation claim.

---

[9]   Of course, Wells Fargo negotiated the Modification Agreement with Dr. Wagner before the Amended Disclosure
Statement (Second) was ever filed with the Court, and well before Asset Management ever announced its position in
response to the Debtor's Disclosure Statement and Plan.

5.   *The Fact that Asset Management Purchased the Loan at a Discount Does not Disqualify it from Claiming Equitable Subrogation.*

Wells Fargo argues further that the equities do not strongly favor Asset Management because Asset Management purchased the GMAC loan at a steep discount. As noted, Asset Management paid only $15,557.06 for the loan, for which it now seeks to be equitably subrogated in the amount of $84,529.

Wells Fargo relies principally on Judge Mitchell's Opinion in the Botero-Paramo case. *In re Botero-Paramo*, 445 B.R. 530 (2011). There, Judge Mitchell stated as follows:

> [T]he most significant difference between this case and Joynes is that BONY Mellon did not make the loan that paid off First Savings. It acquired the note, not only at a very substantial discount, but also after the priority of its security had been challenged in this court. Since equitable subrogation exists to protect justifiable expectations, the question squarely arises whether it has any applicability when the party seeking to invoke it either knew or had the ready means of knowing that it was buying a problematical asset. Here BONY Mellon acquired its interest in the American Brokers Conduit note not as a holder in due course but only after the priority of the deed of trust had been squarely challenged in litigation. Although the transfer of a negotiable instrument carries with it the legal rights of the transferor—including the right to enforce it according to its terms—it does not necessarily substitute the transferee to the equitable position of the transferor. Put another way, while equity will intervene to protect an innocent party against loss when that can be done without prejudice to an equally innocent party, here BONY Mellon is seeking not to be protected against a loss but instead to garner a profit. Under the circumstances, the court can only conclude that the equities simply do not favor subrogating BONY Mellon to the position of First Savings.

445 B.R. at 542-43.[10]

The Fourth Circuit declined to take up this argument, in affirming Judge Mitchell. *In re Botero-Paramo*, 483 Fed. Appx. at 786 ("We need not decide the complex threshold question of whether the purchaser of an interest in a lien assumes the equitable position of the seller under Virginia law. Even assuming that BONY stepped into the equitable position of Sutton and ABC,

---

[10]   In *Botero-Paramo*, BONY-Mellon acquired the Note only after litigation had already been commenced, challenging the lien position of Sutton, BONY-Mellon's predecessor in title. Here, there was no litigation pending at the time that Asset Management acquired the Note.

the original lender, we find that subrogation is inappropriate in these circumstances because it would prejudice Tysons.") The Virginia Supreme Court has never addressed the question, and the Court is not aware of cases from other jurisdictions adopting a rule that assignees who purchased their loans at a discount are never entitled to subrogation. Adopting such a rule certainly would be inconsistent with Virginia's "liberal application" of the law of equitable subrogation.

There are two reasons to avoid the adoption of a blanket rule barring assignees from asserting equitable subrogation. First, the rule would invite the Court to make arbitrary line-drawing decisions. When does a discount become a windfall?  At fifteen percent? Twenty percent? Anything less than one hundred percent?  The Court is not aware of any principled basis on which to make such a decision.

Second, and more fundamentally, adopting a rule that assignees who purchase notes at a discount are never entitled to subrogation would mean that an assignee would be purchasing something less than the entire rights of the assignor. In Wells Fargo's view, an assignee takes everything that the Note represents, *except for* equitable subrogation rights. This is inconsistent with the free transferability of negotiable instruments. In fact, most residential mortgage notes are assigned at least once, from the originating lender to institutional lenders such as Wells Fargo. Loans are often then sold any number of times thereafter. To deny equitable subrogation to assignees would be to diminish the value of commercial paper.[11]

It is hard to describe Asset Management's claim of equitable subrogation as a windfall. Asset Management certainly purchased the GMAC Note at a substantial discount. Inherent in

---

[11]   The Fourth Circuit recently upheld the application of equitable subrogation in favor of an assignee, in an unreported decision. *Holliday v. Holliday,* 522 Fed. Appx. 174, 176 (4th Cir. 2013) (applying Maryland law, and stating: "Ms. Holliday provides no authority indicating that equitable subrogation is dependent upon the subrogee's status as a bona fide purchaser, and we have found none") .

that discount is the element of risk – perhaps, at the time that it bought the Note, Asset

Management would be entitled to subrogation, perhaps it would not be. But the fact that a risk

pays off does not mean that Asset Management is receiving a windfall. And, the fact that Asset

Management purchased the GMAC Note at a discount is entirely fortuitous to Wells Fargo.

Wells Fargo did not extend any credit based on the idea that Asset Management is not entitled to

equitable subrogation. Viewed differently, had GMAC never sold its Note (an event over which

Wells Fargo had no control), Wells Fargo would be in precisely the same position.

The fact that Asset Management purchased the GMAC Note at a discount does not

disqualify it from seeking equitable subrogation.

   6.  *GMAC's Negligence Was Ordinary Negligence, and Asset Management's Purchase
       of the Loan Was Fortuitous, as far as Wells Fargo is Concerned.*

Finally, Wells Fargo argues that the equities do not strongly favor Asset Management

because both GMAC and Asset Management were more than ordinarily negligent. First, Wells

Fargo argues that GMAC was negligent in that: (a) GMAC failed to conduct a title search before

recording its $140,000 Deed of Trust; and (b) GMAC waited almost five weeks, from August 20,

2007, to September 27, 2007, to record its Deed of Trust. The first issue was squarely addressed

by the Virginia Supreme Court in *Joynes*, where it stated:

> [A] party advancing money to discharge a prior lien who does not search the records to
> discover other liens, but who relies, for example, on the borrower's assurances that there
> are no other liens is not barred from his right of subrogation as against a junior
> encumbrancer who is not prejudiced.

179 Va. at 404; 18 S.E. at 921.

As for GMAC's failure to timely record its Deed of Trust, the only failure of significance

was the failure to record for 9 days, i.e., the period between August 20, 2007, when GMAC

closed its loan, and August 29, 2007, when Wells Fargo disbursed its loan proceeds. After that,

21

the horse was out of the barn, so to speak, and Wells Fargo cannot claim any prejudice accruing thereafter. As the Virginia Supreme Court held in *Joynes*, "the negligence should be chiefly of significance when there are subsequently intervening rights involved which would be prejudiced if subrogation were allowed." 179 Va. at 404; 18 S.E. at 921. The failure to record for a period of 9 days, or even for a period of five weeks, cannot be described as being grossly negligent, as Wells Fargo would have it. The failure to record was the product of ordinary negligence.

Wells Fargo is correct that Asset Management's acquisition of the loan was preceded by minimal due diligence. Asset Management did not conduct a title search, and chose to rely on an internet property search and a credit report on Dr. Wagner (which itself failed to list Wells Fargo's judgment). Again, though, in assessing the consequences of Asset Management's casual approach to its acquisition of this loan, we look to whether Wells Fargo was prejudiced thereby. *Id.* The fact of the matter is, had Asset Management conducted no due diligence and purchased the loan sight unseen, it would still be entitled to step into the GMAC lien position. Asset Management's acquisition of the loan was entirely fortuitous, as far as Wells Fargo is concerned. Further, Asset Management's negligence – the failure to conduct a title search prior to acquiring the loan – was no worse than GMAC's negligence in failing to conduct a title search, which as noted, the Virginia Supreme Court in *Joynes* held was not culpable negligence.[12]

---

[12]   The Court parts company here with the Restatement (Third) of Property, which abandons any reliance on the actual knowledge of the subrogee as being relevant to the inquiry. The Restatement Comments state:

> Many judicial opinions dealing with a mortgagee who pays a preexisting mortgage focus on whether the payor had notice of the intervening interest at the time of the payment. Most of the cases disqualify the payor who has actual knowledge of the intervening interest, although they do not consider constructive notice from the public records to impair the payor's right of subrogation. Under this Restatement, however, subrogation can be granted even if the payor had actual knowledge of the intervening interest; the payor's notice, actual or constructive, is not necessarily relevant. The question in such cases is whether the payor reasonably expected to get security with a priority equal to the mortgage being paid. Ordinarily lenders who provide refinancing desire and expect precisely that, even if they are aware of an intervening lien. See Illustration 26. A refinancing mortgagee should be found to lack such an expectation only where there is

In *Botero-Paramo*, the Fourth Circuit noted that junior lienholders have a right to expect that senior liens eventually will be paid, and that the junior liens will move up in priority. In that case, however, the amounts due under the first deed of trust were due and payable in full only 18 months after the refinancing deed of trust was recorded. 483 Fed. Appx. at 787 ("Although it is undoubtedly true that Tyson's predecessor, CFUSA, originally had a lien junior to the FSM First DOT, the FSM First DOT was due on July 1, 2007. In other words, the CFUSA Refinancing DOT would become the senior lien 18 months after it was recorded.")  In this case, by contrast, the GMAC loan was a HELOC and could be re-advanced multiple times, even if Dr. Wagner had paid the loan down to zero. *See* Finding of Fact No. 3, above. Wells Fargo, therefore, had no legitimate expectation that any paydown of the HELOC would redound to its benefit, as in *Botero-Paramo*.

As for the increase in the HELOC from $90,000 to $140,000, this has always been resolved by limiting the subrogee's rights to the amount actually paid to the prior lienholder (in this case, GMAC paid itself $84,529). See *In re Reasonover*, 236 B.R. at 232 (limiting subrogee's rights to the amount of prior lien). The Comments to the Restatement (Third) of Property: Mortgages, state as follows:

> Subrogation will be recognized only if it will not materially prejudice the holders of intervening interests. The most obvious illustration is that of a payor who lends the mortgagor more money than is necessary to discharge the preexisting mortgage. The payor is subrogated only to the extent that the funds disbursed are actually applied toward payment of the prior lien. There is no right of subrogation with respect to any excess funds. See Illustration 28.

---

affirmative proof that the mortgagee intended to subordinate its mortgage to the intervening interest. See Illustration 27.

Restatement (Third of Property): Mortgages, § 7.6, Comment (e) ("Performance at the Request of the Debtor"). This goes farther than the Virginia courts have gone in granting equitable subrogation. As noted above, however, the ordinary negligence of the subrogee will not bar equitable subrogation.

23

Restatement (Third) of Property: Mortgages, § 7.6, Comment (e) ("Performance at the Request of the Debtor").

Again, the Court does not see any prejudice to Wells Fargo by the increase of the HELOC, as long as the payoff of the prior lien did not exceed $90,000, the amount to which Wells Fargo's predecessor, Wachovia, specifically expected to be junior in priority.

In the end, Wells Fargo bargained for a third lien position. Equitable subrogation is about respecting and enforcing the bargained-for expectations of the parties. To elevate Wells Fargo's lien to a second lien position would create a windfall for Wells Fargo. Allowing equitable subrogation will put the parties into their expected lien positions. Asset Management is entitled to step into GMAC's lien position, nothing more.

### Conclusion

For the foregoing reasons, it is hereby **ORDERED**:

1.      The Court grants Asset Management's Motion for Summary Judgment on Count I, and denies Wells Fargo's Motion for Summary Judgment on Count I. Asset Management is entitled to be equitably subrogated to GMAC's second priority lien in the amount of $84,529.

2.      The Clerk will mail copies of this Order, or provide cm-ecf notice of its entry, to the parties below.

Date: Nov 18 2013

Alexandria, Virginia

/s/ Brian F. Kenney

Brian F. Kenney
United States Bankruptcy Judge

Entered on Docket: November 19, 2013

Copies to:

Ronald J. Drescher, Esquire
Drescher & Associates
4 Reservoir Circle, Ste 107
Baltimore, MD 21208
Counsel for the Plaintiff

Richard J. Stahl, Esquire
Stahl Zelloe, P.C.
11350 Random Hills, Road, Suite 700
Fairfax, VA 22030
Counsel for the Defendant, Robert Scott Wagner

Michael A. Condyles, Esquire
Kutak Rock LLP
1111 E. Main Street, Suite 800
Richmond, VA 23219-3500
Counsel for the Defendant, Wells Fargo Bank, N.A.